## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOUSE OF BRANDS KJ PTY LTD., <br>     Plaintiff, <br><br> v. <br><br> ALEX AND ANI, LLC; ALEX AND ANI SOUTH SEAS, LLC; and OMAR AJAJ, individually, <br>     Defendants. | Case. No. 1:18-cv-00494-WES-LDA |

## DEFENDANTS' PRETRIAL MEMORANDUM

**NOW COME** the Defendants, Alex and Ani, LLC, & Alex and Ani South Seas, LLC (collectively "Alex and Ani"), and Omar Ajaj (collectively with Alex and Ani "Defendants"), and hereby submits their pretrial memorandum.

### Discussion of Facts

**A. The Agreement**

This matter stems from an agreement in November of 2015 (hereinafter "the Agreement") between the Defendant Alex and Ani South Seas, LLC and the Plaintiff House of Brands, (hereinafter "HOB"), in which HOB would distribute Alex and Ani's product in the territories of Australia, New Zealand and Fiji. HOB is owned and run by Karin Adcock. Ms. Adcock is an expert in the industry, owns multiple businesses and was previously involved in establishing and growing major brand companies such as Pandora in Australia. Ms. Adcock, clearly a sophisticated party, along with her experienced and multinational law firm and business partners negotiated the terms of the Agreement over an extended period of time.

1

Ms. Adcock negotiated, on behalf of her company HOB, a means where HOB could voluntarily terminate the Agreement should she determine that the business was no longer viable. Ms. Adcock wanted Alex and Ani to agree to buy back remaining inventory in the event of termination.  Alex and Ani did not initially agree to this, however, eventually the parties agreed to a provision (section 10.4 of the Agreement), which would allow Ms. Adcock discretion to terminate the Agreement once she provided notice nine (9) months prior to termination.  Alex and Ani would then purchase the remaining inventory at Alex and Ani costs.  This compromise allowed HOB some recovery should HOB decide to terminate.

Ms. Adcock further negotiated for terms which would provide some greater protection for HOB should Alex and Ani decide to terminate the Agreement.  The terms governing this scenario provide for Alex and Ani to buyback product at HOB costs should Alex and Ani decide to terminate the Agreement.  The Agreement provides for additional financial obligations for Alex and Ani should Alex and Ani decide to terminate the Agreement.

After much discussion, revisions and thorough review by both parties and their legal counsel, the parties executed the Agreement.   The Agreement provides that the executed version is the entire agreement and supersedes all prior oral or written agreements between the parties.  It further provides that the Agreement may not be amended, modified, discharged or terminated orally.

   B.  **Termination of the Agreement**.

On April 13, 2017, HOB, through its counsel, sent Alex and Ani a letter terminating the Agreement pursuant to section 10.4.  HOB determined that the business was not viable in Australia and other territories. No other sections of the Agreement were referenced in the HOB termination letter.

Prior to and after sending the termination letter, HOB attempted to re-negotiate the terms of the Agreement. Alex and Ani declined to do so. On or about January 22, 2018, HOB closed out its Alex and Ani distribution business. On or about March 6, 2018, HOB sent shipment of the remaining licensed inventory and displays to Alex and Ani in the United States. Said shipment was received on or about March 21, 2018.

### C. HOB Attempts at Re-negotiation.

HOB began to try and re-negotiate the terms of the Agreement as early as nine months after its execution. It can only be assumed that Ms. Adcock believed that once Alex and Ani was introduced in Australia, Alex and Ani would not want to withdraw from the Australian market as it would lose profits and cause damage to its brand. Ms. Adcock decided to enter into the Agreement with Alex and Ani with the hopes that she could invest initially and eventually sell her portion of the business at great profit similarly to what she was able to do with Pandora. However, Ms. Adcock attempted to do so in a very short timeframe.

Ms. Adcock almost immediately sent Alex and Ani multiple proposals to have Alex and Ani take over her business after her initial investment. When Alex and Ani would not agree to Ms. Adcock's proposals, HOB sent Alex and Ani the termination notice. HOB continued to try and re-negotiate with Alex and Ani and on April 27, 2017, HOB sent Alex and Ani a draft Deed of Rescission and Variation, drafted by Norton Rose Fulbright Australia. This draft Deed of Recission altered the terms of the Agreement. In particular, the Deed of Recission attempted to alter the provision which allowed HOB to terminate the Agreement by requiring Alex and Ani to buy back remaining licensed products at HOB cost and not Alex and Ani cost. Alex and Ani did not agree to the terms of the Deed of Recission.

### D. Ms. Adcock relationship with Defendant Omar Ajaj.

During the course of the relationship between Alex and Ani and HOB, Ms. Adcock often communicated with former employee, Omar Ajaj. Mr. Ajaj and Ms. Adcock conversed often as Mr. Ajaj was the Director and the Vice President of International Sales at the time. Although Ms. Adcock also communicated with many other people at Alex and Ani, including Daniel Sills, Mr. Ajaj's supervisor. In fact, Ms. Adcock was initially contacted by Mr. Sills as he knew her from his previous work with their former employer, Pandora.

Ms. Adcock was aware that Mr. Ajaj is married to Carolyn Rafaelian's niece. Carolyn Rafaelian is the founder and CEO of Alex and Ani. Ms. Adcock continued to email Mr. Ajaj directly even after she was informed that he was no longer involved with the account. Moreover, Ms. Adcock plainly stated that she sued Mr. Ajaj in his individually capacity in order to gain the attention of Alex and Ani (Ms. Rafaelian) and in the hopes of a quick settlement.

On January 12, 2018, Mr. Ajaj sent HOB an email purportedly on Alex and Ani's behalf confirming that Alex and Ani would pay HOB once the returned inventory was received and counted. The email suggests that Alex and Ani would pay for the insurance and the cost of shipment, although the terms of the Agreement do not allocate responsibility of shipping costs to Alex and Ani. Further, it is clear that the Agreement does not require Alex and Ani to pay for returned displays.

### E. HOB Inventory Invoices.

The invoices sent by HOB for the return of product inaccurately value the licensed product at HOB cost and not Alex and Ani cost. Further, the invoices list an additional 5,096 units that were never received by Alex and Ani. HOB sent these invoices knowing that the

Agreement called for reimbursement at Alex and Ani cost rather than HOB cost.  Ms. Adcock hoped that Alex and Ani would simply reimburse her based on the inventory invoices she provided and not based on the terms of the Agreement.

## Applicable Law

1. **The Agreement is valid and unambiguous.**

HOB and Alex and Ani are sophisticated parties who entered into an Agreement after months of negotiating.  Both parties were represented by counsel. Neither party disputes the validity of the Agreement. There is no ambiguity in the Agreement and it clearly mandates that HOB be reimbursed at Alex and Ani cost should HOB terminate the Agreement before its expiration.

Section 10.4 governs the process should HOB decide to terminate the Agreement before its expiration. Section 10.4 of the Agreement states:

> 10.4 Licensee Right to Terminate With Advance Notice.  On occurrence of any of the following, Licensee may, but is not required to, terminate this Agreement without prejudice to enforcement of any other legal right of remedy upon giving advance written notice of such termination and the reason or reasons therefor within the time period stated:
>
> (i)   Business Viability.  If Licensee determines that the ALEX AND ANI business is not viable in the Territory Licensee may give Licensor nine (9) months' prior written notice of its desire to terminate the Agreement.  No Retail Store Buy Back or Business Buy Back fee payments shall be paid to Licensee if the Agreement is terminated pursuant to this Section 10.4(i). However, the Licensor will purchase back all the Licensed Product inventory from the Licensee at a price equal to that ***paid by the Licensor*** for such products within sixty (60) days of the termination under this section.

This provision provides the process for when HOB decides to terminate the Agreement, which it did.

5

Section 10.5 provides the terms and conditions should *Alex and Ani* terminate the Agreement before its expiration. Section 10.5 states:

> 10.5 <u>Early Termination</u>. At any time during the Term, Licensor shall have the right to terminate this Agreement for any reason not set forth in Sections 10.1 and 10.2 above provided that Licensor pays Licensee the Business Buy Back fee calculated as set forth on <u>Schedule B</u> attached hereto.

Section 10.6 further controls the provisions of 10.5 and the procedure at the expiration of the Agreement or should Alex and Ani decided to terminate the Agreement early.  Section 10.6 states:

> 10.6 <u>Consequences of Termination</u>.  Upon termination of this Agreement for any reason (other than because of default by Licensor) or expiration of the Term, Licensee shall comply with all of the following requirements:
>
> (i) <u>Cure of Default</u>.  So that Licensor may protect the Licensed IP and Licensor's other Licensees, Licensee shall, immediately upon Licensor's request, permit Licensor or its authorized representatives to cure any default and to secure Licensee compliance with other obligations set forth in this section.
>
> (ii) <u>Leases/Agreements</u>.  To the extent permitted by the lessor, Licensor shall have the right, but not the obligation, to require Licensee to execute any lease assignments or other necessary documents and take any other actions requested by Licensor to allow Licensor or its designee to take over Licensee's lease with respect to any Retail Store,  In addition, to the extent permitted, Licensee shall assign to Licensor any material agreements it may have with distributors, shipping companies, warehouses, advertisers, or other third parties utilized or involved in the operation of the Retail Store or the distribution, shipping, transportation, advertising or sale of the Licensed Products,
>
> (iii) <u>Right to Purchase Remaining Inventory and Displays</u>.  Upon expiration or termination of the Agreement for any reason, Licensee shall immediately notify Licensor of the Licensed Products remaining in Licensee's possession or under its control and unsold on the date of termination or expiration (the "Remaining Inventory") as well as any Displays removable from Retail Stores and Shop-in Shops.  Licensor shall then (i) repurchase all Remaining Inventory at a price equal to the price paid by the Licensee for such Licensed Products and (ii) have the option to purchase the Displays at a price to be determined by the parties but in no event more than Licensee's actual, out-of-pocket cost less depreciation of twenty percent (20%) per annum. Licensee shall deliver the Remaining Inventory and any Displays purchased by Licensor within fifteen (15) days.  Payment shall be due upon delivery, provided, however, that Licensor may deduct from the purchase price for such Remaining Inventory or Displays any amount owed to it by Licensee.

>        (iv) Destruction of Unpurchased Displays.  Any Displays not purchased by Licensor must be destroyed by Licensee at Licensee's expense.  Licensee shall provide Licensor with an affidavit of destruction evidencing the same, signed by an officer of Licensee, in a form acceptable to Licensor.

Section 10.6 provides greater protection to HOB because it contemplates a situation where HOB did not voluntarily end the Agreement. Section 10.4 allocates additional risk to HOB because it contemplates a situation where HOB exclusively decided to terminate the Agreement before its expiration and through no fault of Alex and Ani. HOB through Ms. Adcock was/is the expert on the Australian market and Alex and Ani was completely at its mercy in regards to knowledge of that market. Ms. Adcock specifically negotiated these terms of the Agreement. This a fair and reasonable arrangement between two sophisticated parties.

2. **Parol evidence rule excluded the use of extrinsic evidence purporting to contradict the terms of the Agreement.**

Here, the Agreement is clear and previous discussions or drafts must be excluded as evidence in an attempt to alter the terms of the Agreement.  "The parol evidence rule states that in the absence of fraud or mistake, parol evidence of prior or contemporaneous agreements is generally inadmissible for the purpose of varying, altering or contradicting a written agreement. *Fram Corp. v. Davis*, 121 R.I. 583, 586–87, 401 A.2d 1269, 1272 (R.I. 1979). *Industrial National Bank v. Peloso*, R.I., 397 A.2d 1312 (R.I. 1979); *American Underwriting Corp. v. Rhode Island Hospital Trust Co.*, 111 R.I. 415, 303 A.2d 121 (R.I.1973); *Healy v. Tidewater Oil Co.*, 104 R.I. 81, 242 A.2d 298 (R.I. 1968); *Supreme Woodworking Co. v. Zuckerberg*, 82 R.I. 247, 107 A.2d 287 (R.I. 1954).

"Further, we have stated that an integrated document is one where the parties adopt a writing or writings as a final and complete expression of the agreement, and that parol evidence of preliminary negotiations is admissible to determine if a contract is integrated. Thus, when

parties to a contract have adopted a written agreement as the final expression of their intention in regard to a portion of or the entire subject matter of the transaction, all other expressions of intention that have occurred prior to or contemporaneous with the making of the agreement are immaterial in ascertaining the terms of the transaction." *Fram Corp. v. Davis*, 121 R.I. 583, 587-8, 401 A.2d 1269, 1272 (R.I. 1979)(*internal citations omitted*).

The Agreement is clear and unambiguous in that HOB is only entitled to Alex and Ani's cost of licensed merchandise upon receipt of the remaining inventory. Further the Agreement has an "integration clause" which states:

> 15.12 Entire Agreement. This Agreement supersedes all prior oral or written agreements between the parties with respect to the License within the Territory and constitutes (along with the agreements and documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to the License within the Territory and the supply of the Licensed Products. This Agreement may not be amended, modified, discharged or terminated orally. No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by the parties hereto.

Accordingly, HOB is only entitled to reimbursement at Alex and Ani costs and must be excluded from arguing or presenting evidence which would contradict the terms of the Agreement.[1]

3. **A mutual mistake does not exist here; and therefore, HOB is not entitled to a reformation of the Agreement.**

HOB alleges that there is a mistake in the Agreement and asks this Court to reform the Agreement. For a court to reform an agreement "it must appear that by reason of mistake, common to the parties, their agreement fails in some material respect correctly to reflect their

---

[1] Should this Court determine that the Agreement is ambiguous, Alex and Ani is prepared to present prior versions which include buy back at Alex and Ani cost. One version included an additional separate section stating buyback at Alex and Ani cost should HOB decide to terminate with HOB counsel notes deleting said section because it was already clearly stated in previous section of the Agreement.

prior completed understanding." *Dubreuil v. Allstate Insurance Co.*, 511 A.2d 300, 302 (R.I. 1986). A mutual mistake is a mistake "common to both parties wherein each labors under a misconception respecting the terms of the written agreement sought to be cancelled." *McEntee et. al. v. Davis*, 861, A.2d 459, 463 (R.I. 2004). A unilateral mistake does not create the right to rescind a contract." *Id*.

Here, HOB alleges a mistake was made in the construction of section 10.4 of the Agreement. However, Alex and Ani asserts that it was no mistake. The Agreement was finalized after repeated drafts and negotiations and thorough review of the parties' counsel. Even if we were to believe that HOB and Ms. Adcock were not aware of what the Agreement stated, their mistake was a unilateral misunderstanding and not a mutual mistake of both parties.

4. **HOB is not entitled to shipping and insurance cost or re-imbursement for displays.**

Pursuant to section 10.4 of the Agreement, HOB is not entitled to re-imbursement for shipping and insurance costs or for the costs of displays returned. The Agreement is silent on the allocation of shipping and insurance costs in the event that HOB terminates the Agreement early. Further, the Agreement is clear in that Alex and Ani is not obligated to buyback displays. Accordingly, HOB is only entitled to Alex and Ani's cost of the returned licensed products not including displays.

5. **The invoices sent by HOB do not accurately reflect the inventory received by Alex and Ani.**

HOB sent invoices to Alex and Ani, which do not accurately list the inventory received by Alex and Ani. Specifically, the shipment sent did not include 5,096 units, which were invoiced by HOB. Accordingly, HOB is not entitled to receive payment for those missing units.

6. **HOB Bad Faith Actions**

HOB acted in bad faith when it purposefully tried to have Alex and Ani buy back the remaining inventory at HOB cost.  Ms. Adcock was well aware that section 10.4 called for buy back at Alex and Ani costs, however, she hoped that Alex and Ani employees would not review the Agreement and simply pay the amounts HOB invoiced.  HOB tried to avoid the explicit terms of the Agreement and take advantage of less experienced employees at Alex and Ani.

HOB asserts that it relied on Omar Ajaj's representations that Alex and Ani would buy back the inventory at HOB cost.  However, HOB made that request in bad faith, knowing that it was contrary to the terms of the Agreement.  HOB, acting in bad faith cannot claim to rely on an alleged representation of an employee when HOB knew that the alleged representation was wrong.

Further, HOB clearly acted in bad faith by suing Mr. Ajaj in his individual capacity.  Ms. Adcock included Mr. Ajaj as a Defendant because he is married to Ms. Rafaelian's niece.  Ms. Adcock even stated under oath that Mr. Ajaj was included as a defendant in an effort to gain the attention of Alex and Ani (Ms. Rafaelian) and in the hopes of a quick settlement.  Ms. Adcock further stated that she did not believe Mr. Ajaj acted badly or intentionally tried to mislead HOB.

7. **Damages.**

HOB is not entitled to any damages as it acted in bad faith when it tried to re-write the terms of the Agreement without the knowledge or consent of Alex and Ani.  HOB is entitled only to the cost of the actual returned inventory based on Alex and Ani's cost pursuant to the terms of the Agreement.

## Trial and Motions

Defendants expect the trial of this matter to last seven to ten days.

Defendants will submit to the Court a witness list, an exhibit list, and proposed jury instructions and jury verdict form at least 14 days before jury selection in accordance with the Court's Standard Pretrial Order.

Defendants also intend to file various motions *in limine* prior to trial, including motions seeking to exclude testimony that is irrelevant and that would cause unfair prejudice to Defendants, confuse the issues, mislead the jury, and cause undue delay in violation of Federal Rules of Evidence Rules 401-403.

/s/ Richard S. Humphrey_____
Richard S. Humphrey, Esq. RI #2920
THE LAW OFFICES OF RICHARD S. HUMPHREY and on behalf of GERAGOS & GERAGOS, APC
3852 Main Road
Tiverton, RI 02878
(401) 624-6152
staff@richardhumphreylaw.com
geragos@geragos.com

**CERTIFICATE OF SERVICE**

I certify that a copy of this document filed through the ECF system will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 14, 2020.

/s/ Allyson M. Quay